THARP (TILLEY v.). See Case No. 14,047.

THARP (UNITED STATES v.). See Case No. 16,458.

THATCHER (EVERETT v.). See Case No. 4,578.

## Case No. 13,862.

### THATCHER v. McCULLOH.

[Olc. 365.] [1]

District Court, S. D. New York. June, 1846.

AFFREIGHTMENT—ACTION—DEVIATION—USAGE—DAMAGES AS SET-OFF.

1. An action for the recovery of freight lies in admiralty in favor of the master of a ship against the consignee of cargo, equally in personam and in rem.

2. An intention of the master of a ship to depart from her direct voyage and stop at an intermediate port for the purpose of taking in additional cargo, if assented to or made known to a shipper when bills of lading are executed to him, is not a deviation which annuls the contract of affreightment on his part.

3. If it might amount to a violation of the contract per se, the acceptance of the cargo by the shipper, with knowledge of the fact of deviation, restores to the ship-owner his right to freight.

4. The known usage of trade and navigation from New Orleans to Northern ports, in the summer season, to touch at Havana for further cargo, prevents such act being a deviation, although the freighter had no notice of the intention of the master to make that port on the particular voyage.

[Cited in Hostetter v. Gray, 11 Fed. 181; Hostetter v. Parks, 137 U. S. 40, 11 Sup. Ct. 4.]

5. Although the further stopping at Key West on the voyage, without the assent or knowledge of the freighter, is an unwarranted deviation which may avoid the contract of affreightment at the option of the freighter, his acceptance of the cargo, with full knowledge of the deviation, reinstates in the master the right to recover the freight; but receiving the cargo in that manner does not deprive the consignee of a right of action for any special damages he may have sustained because of the deviation.

6. The court is not under the necessity of driving the consignee to a cross-action in such case, nor for recovery of other damages or claims arising out of the contract, but may adjust and recompense his damages by way of recoupment in the action prosecuted for freight.

[Cited in Kennedy v. Dodge, Case No. 7,701; Holyoke v. Depew, Id. 6,652; Ebert v. The Reuben Doud, 3 Fed. 522.]

[See Bearse v. Ropes, Case No. 1,192.]

7. Those damages may embrace whatever could be demanded by a cross-action for the nonfulfilment of the contract of affreightment, including extra premiums of insurance paid because of the deviations on the voyage.

This was an action by [Charles Thatcher] the master of the ship Celia against [James

1 [Reported by Edward R. Olcott, Esq.]

McCulloh] the consignee of part of her cargo to recover freight on a shipment of lead from New Orleans to New York. The bills of lading were dated at New Orleans the 27th and 29th of August, 1844. The ship sailed about the time of their date, partly laden, and ran to Havana, to take in the complement of her cargo. She arrived there the 1st of October, just previous to a hurricane, which set in at that period in that latitude. The Celia was a general ship; her main loading was cotton; the lead on board composed her ballast. Not succeeding in filling up her cargo readily at Havana, she went over to Key West, and took in her lading of cotton from a French vessel, wrecked in that vicinity. Key West lies 60 to 70 miles north of Havana, and 30 to 40 off the usual track or route of vessels from Havana to New York. The ship was detained about two days at Key West, in taking in her cargo. She arrived in New York in November. The consignee was advised, before the arrival of the ship, of the deviation to Havana and to Key West, and effected extra insurances for those runs on account of the deviations. It is the notorious usage at New Orleans for general ships bound to Northern ports in the summer season, because of the difficulty of obtaining full cargoes at that period in New Orleans, to touch at Havana on their home voyage to make up their lading. There was evidence, also, in the case, that it was understood between the agent of the consignee and the agent of the ship when the affreightment of the lead was made, that the ship would probably follow that custom; and that in case she touched at Havana, the extra insurance therefor was to be at the charge of the ship. The shipment of lead was accepted by the consignee at New York, less fifty pigs short of the amount stated in the bills of lading. Testimony was taken on the trial, to a great extent, in relation to the state of the lead market in this port when the ship would be properly due here, according to usual voyages at that season direct from Havana, and at the time of her actual arrival. The main bearing of it showed a declining market, as is usual through the fall months and December; but the rate of depreciation appeared very unsettled, and no precise certainty of the value of lead at the two points indicated was established, and the evidence failed to show there was any appreciable change of prices for ten or twenty days directly preceding the arrival of the ship here. Demurrage was claimed for the delay of the voyage by taking the circuitous route and stopping at Havana and Key West. But the evidence did not go beyond loose conjectures and estimates as to the loss of time, and was not in harmony as to any loss at all having been so occasioned. Objections were taken to the competency of a court of admiralty to entertain an action by the master of the ship against the consignee in personam for freight; and the defence further insisted that the deviations on the voyage annulled the contract of affreightment in favor of the ship, and that no action was maintainable thereon by master or owner.

A. W. Bradford, for libellant.

Jesse C. Smith, for respondent.

BETTS, District Judge. A leading point made by the respondents is, that the court cannot take jurisdiction of an action in personam, for freight brought by a master of a vessel against a consignee of her cargo. It is not controverted that the vessel is bound to the shipper for the delivery of the cargo, nor but that the cargo is bound in rem for the payment of freight; but it is urged upon the notion of the English common-law courts, that the action against the consignee upon the implied contract to pay freight, must be sued in a court of law in the name of the ship-owner. No additional light can be thrown upon the question of the jurisdiction over the subject in this court by restating the decisions already before the public, or the principles upon which they rest. I consider the rightful jurisdiction of the admiralty in such cases fully sustained by the authority of the eminent jurists who have discussed and sanctioned it. The Volunteer [Case No. 16,991]; Certain Logs of Mahogany [Id. 2,559]; Drinkwater v. The Spartan [Id. 4,085]; 3 Kent, Comm. (3d Ed.) 218, 223; Cleirac, 722; Boul.-P. Dr. Com. 297. I hold, in concurrence with the doctrines of those authorities, that this court has jurisdiction over the subject matter. The method of exercising the jurisdiction is merely matter of practice; and the remedy is no more restricted in principle to actions in rem than in personam. Indeed, in the original constitution of the court, suits in their personal form were those in which the jurisdiction was most distinctly exercised (2 Browne, Civ. & Adm. Prac. 432; Clarke, Praxis Adm. tit. 1, Marr. Form. 30); and there is no principle involved in the functions of the court which imparts to it cognizance in rem over a broader field of cases than falls within its powers in actions in personam. [Astor v. Wells] 4 Wheat. [17 U. S.] 479. Its special and vital properties are the brevity, simplicity and celerity of its proceedings, adapting it to the emergencies of commerce and navigation. 1 Kent, Comm. 380. If the respondent intended to set up the alleged deviation of the ship on her voyage as a rescission of his liability for freight, he should have refused to receive the cargo. By accepting that, he waived the right to annul the whole contract, and must rely upon his right to indemnification under it because of its imperfect fulfilment. Abb. Shipp. 192; 3 Kent, Comm. 221.

Although the evidence falls short of proving a direct consent on the part of the respondent to the libellant, in respect to this particular shipment, that the voyage might be made by way of Havana, yet the assent of his agent to the agent of the ship in regard to other shipments on board her at the same

time, of like goods, to the same destination, that the circuitous route might be run, affords a reasonable implication that the arrangement with all the freighters was substantially of a common import, and with the understanding that the ship was to touch at Havana for the purpose of making up a full cargo. I think, independently of any binding assent to the circuitous voyage, that the evidence establishes sufficiently the usage of the trade in respect to voyages from New Orleans to New York in general ships, at that season when freights are short, to have been to touch at Havana to complete their cargoes. The evidence satisfactorily shows that the entire voyage in that way is usually essentially expedited. The shipper must be supposed cognizant of this course of trade, and to have had it in view when the contract was entered into, and cannot, therefore, take exception to it because the deviation may affect his insurance. Abb. Shipp. 192; 1 Phil. Ins. 182–184; 1 Cond. Marsh. c. 6, § 2, pp. 185, 186. Nor probably would such departure from a direct voyage be a deviation which would affect the policy. 2 Phil. Ins. c. 12, § 1. In a case before Lord Eldon, on a vessel bound from Newfoundland to Portugal, where the vessel went to Sidney, in Nova Scotia, for a cargo of coals, he rules that such subordinate voyage, being in conformity to usage, was not a deviation. Ougier v. Jennings, 1 Camp. 505, note; Lockett v. Merchants' Ins. Co., 10 Rob. (La.) 339. By a bill of lading, expressing that goods are to be carried from one port to another, a direct voyage is prima facie intended; but this presumption may be controlled by a usage to stop at intermediate ports, or by personal knowledge on the part of the shipper that such a course is to be pursued. Lowry v. Russell, 8 Pick. 360. A ship, under these circumstances, would ordinarily be detained at New Orleans a period greatly longer to fill up her freight than is required to run the additional distance by way of Havana.

Under the proofs, the voyage in question, by way of Havana, did not amount to a deviation which affected the rights of the ship-owner, as against the shippers, [Oliver v. Maryland Ins. Co.] 7 Cranch, [11 U. S.] 487, —and but from her afterwards putting into Key West, without necessity, there would be nothing in this branch of the case demanding special consideration. After stopping at Havana and finding her cargo could at once be made up at Key West, she run over and filled up at that port. There is no evidence that it was a customary course for vessels from New Orleans, or even from Havana, to touch at Key West. 1 Phil. Ins. 154. This was accordingly a deviation which impaired the policies of the respondent, though it might conduce to expedite the voyage. 13 Mass. 68; Roc. Ins. note. 52; 3 Johns. Cas. 10; 2 Johns. 138; Collings v. Hope [Case No. 3,003]; [Mason v. The Blaireau] 2 Cranch, [6 U. S.] 257, note.

In a special action for the loss sustained because of the circuity and delay of the voyage, the freighter might undoubtedly recover damages commensurate to any injury he could prove accrued from that cause; such cross-action might probably be sustained by the merchant, notwithstanding his acceptance of the cargo. Bornmann v. Tooke, 1 Camp. 377. I perceive no objection to adjusting the equitable rights of the parties, without double action, by allowing, by way of recoupment of freight, the amount of damages sustained by the respondent by means of the breach of contract of affreightment in the deviation to Key West. No specific objection has been raised by the libellant to that course, and it may avoid a cross-action, with accumulated expenses. I think it is clear the libellant is entitled to his full freight according to the bills of lading. On the other hand, he should be charged with the invoice value of forty pigs of lead lost on the voyage, with ten per cent. added thereto, and he should also repay the extra insurance because of the circuitous voyage, with interest thereon from the time of its payment to the arrival of the vessel at this port. The consent to vary the route was upon condition that her owner should pay the extra premiums of insurance disbursed by the consignees, to whom the assent was given. The testimony is not very explicit as to the time of such payments, nor indeed to the amount; and the subject must go before a commissioner for adjustment, unless the parties, by stipulation, settle the facts between themselves.

There is no reliable evidence how much, if any, the voyage was prolonged by the ship's touching at Key West. It is reasonably to be inferred that she was delayed all the time of her detention at that port. Still that fact would not afford a satisfactory measure of the time she should have arrived in this port, so as to afford a basis for allowing a quasi demurrage for such period. There is testimony tending to show that entering that port withdrew her from the range of hurricanes prevailing at that season in that region, which might have occasioned a much more serious delay. These contingencies of navigation are not of that definiteness to afford a guide for the computation of detentions and damages therefor. The court cannot speculate upon that point now. The proper time for the respondent to have availed himself of the deviation, it being known to him, was on the arrival of the vessel; and on the circumstances of this case, he should be deemed, by accepting the cargo without objection then, to have waived alike all damages for delays and deviations on the voyage. These particulars will, therefore, be disallowed in the present case, although under a different state of facts they might properly go before a commissioner for investigation and allowance, with other claims for losses or prejudices sustained by the

freighter on the voyage. Nor is the proof on his part satisfactory to show any deterioration in the price of lead within ten or fifteen days antecedent to the arrival of the Celia. The evidence to that point was exceedingly indefinite and discordant, and, I think, in its general result, conduces to establish the contrary.

I accordingly decree for freight according to the terms of the bills of lading, deducting from it the forty pigs of lead not delivered, and allowing the respondent the value of that lead at New Orleans, with ten per cent. added thereto, and also allowing the respondent extra premiums of insurance actually paid by him on account of the change of route, and interest on such extra insurance from the time of payment to the time of the arrival of the ship in this port. If the parties do not, by mutual arrangement, fix the time of the arrival of the Celia in this port, and the time and amount of extra insurance, and the value of the forty pigs of lead in New Orleans, let the case be referred to a commissioner to ascertain and report those particulars. The question of costs will be reserved until it is ascertained whether a balance be due the libellants.