## THE HENRY W. CRAMP.

## McDONALD v. ROSASCO.

Circuit Court of Appeals, Third Circuit.
June 13, 1927.

No. 3607.

1. **Shipping ⊂⊃58(1)—Sole owner of bills of lading purchased from bank, to whom they were indorsed, may sue for breach of charter party.**

Sole owner of bills of lading, under indorsement from bank to whom they had been delivered for full value, *held* entitled to bring libel for damages alleged to have accrued by reason of breach of charter to carry cargo of timber covered by such bills of lading.

2. **Shipping ⊂⊃51(2)—Proceeding to Norfolk, Va., held unwarranted "deviation" from voyage from Pensacola, Fla., to Genoa, Italy.**

Proceeding to Norfolk, Va., *held* to constitute unwarranted deviation from charter party binding schooner to proceed from Pensacola, Fla., to Genoa, Italy, in that the most direct path from Pensacola to Genoa is not by way of Norfolk, though distance after taking advantage of Gulf Stream is very small.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Deviation (in Law of Shipping).]

3. **Shipping ⊂⊃42(7)—Vessel, by accepting cargo and beginning journey, undertook that she was seaworthy and would carry out voyage with reasonable diligence and without deviation.**

Vessel, by accepting cargo and beginning journey in accordance with charter, undertook that she was seaworthy and could commence and carry out charter voyage with reasonable diligence and without unnecessary deviation.

4. **Shipping ⊂⊃51(4)—Schooner coming within governmental embargo by unwarranted deviation cannot excuse noncompliance with charter obligation thereby.**

Where vessel's coming within governmental embargo was solely due to unwarranted deviation, vessel cannot set up as excuse for noncompliance with charter obligation that she was prevented by reason of such embargo from making voyage, in that it was barrier which vessel itself wrongfully raised.

5. **Shipping ⊂⊃51(7)—Charterers, accepting return of cargo under protest because of abandonment, were justified in disposing of it in diminution of damages.**

Where charterers did not accept return of cargo after vessel's unwarranted deviation, but against protest took it because of abandonment by schooner, they were thereafter justified in disposing of cargo in diminution of damages.

6. **Shipping ⊂⊃51(7)—On unwarranted deviation, damages held recoverable on basis of charterers' situation in case charter had been carried out.**

Where charterers, after schooner wrongfully and purposely deviated from course and was unable to complete voyage, protested, and never waived or surrendered their rights, owner of bill of lading covering freight is entitled to damages assessed on basis of charterers' situation in case charter had been carried out and cargo properly delivered.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Libel by Albert T. Rosasco against the schooner Henry W. Cramp; Francis J. McDonald, claimant. Decree for libelant (6 F. [2d] 900), and respondent appeals. Affirmed.

Howard M. Long, of Philadelphia, Pa., and Burlingham, Veeder, Masten & Fearey, of New York City (William J. Dean and Roscoe H. Hupper, both of New York City, of counsel), for appellant.

Loomis & Ruebush, of New York City, and Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (Homer L. Loomis, of New York City, and Howard H. Yocum, of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below, Albert T. Rosasco, the holder and owner of bills of lading, filed a libel against the schooner Henry W. Cramp to recover damages alleged to have accrued by reason of a breach of a charter party entered into by the schooner with the firm of Rosasco Bros. to carry a cargo of pine timber from Pensacola to Genoa, Italy. The libel alleged the schooner had deviated from the charter course, and during the period of deviation had abandoned the cargo and thrown it back on the charterers' hands. The vessel was attached, and released on a bond, and was subsequently lost. The court below heard the case, and decided it on the theory, not on the deviation charged in the libel, but on the ground of a rescission, and made an award on the basis of a return of the freight and insurance premiums which had been paid by the charterers in advance.

The defendant took this appeal, and contends that it is not responsible and the libel should be dismissed. On the other hand, the libelant contends that the true basis of decision should be that the schooner had wrongfully deviated from her chartered route. We here note that, even if the contention of the libelant is correct, as a practical thing, a decree cannot be enforced in excess of the bond and therefore, although libelant's damages might exceed the award made by the court

below, he will be given all practical possible relief by the affirmance of the decree below. Being of opinion that the contention of the libelant as to deviation is well based, we now state our grounds for so holding.

On November 1, 1916, the schooner Henry W. Cramp was chartered by its owners to Rosasco Bros., a firm composed of William S. Rosasco and Albert T. Rosasco, who is the libelant in this case. The charter was for carriage of a cargo of lumber from Pensacola, Fla., to Genoa, Italy, and stipulated "for a voyage from a safe port in the United States Gulf to a safe port on the west coast of Italy, Sicily included, charterers' option of a safe port on the west coast of the United Kingdom, including London." Pursuant to charter, the schooner arrived at Pensacola, and in April or May, 1917, loaded and started on her voyage, before which she was paid in advance freight of $46,995.84, and insurance premiums of $31,842.81. Before sailing the schooner duly issued five bills of lading for the cargo of pitch pine, which bills were subsequently indorsed and negotiated by Rosasco Bros. to the Credito Italiano, a bank at Genoa, and from it bought by Albert T. Rosasco, the present libelant, who resides in Genoa.

The schooner sailed from Pensacola the last of May, but went to Norfolk, Va., where she landed June 27th; but the charterers did not know of her whereabouts until September, when, in answer to their inquiry, they learned of it from A. D. Cummins & Co., of Philadelphia, managing owners of the schooner, who as justification stated, first, that "it was found impossible at Pensacola to secure a crew to go through the war zone, and we therefore had to have the vessel proceed to Norfolk to secure a crew"; second, "we are also engaged in securing war insurance on the vessel"; and, third, that the captain was notified by the collector of the port "that the vessel could not sail on her voyage by reason of a recent ruling and regulation of the United States Shipping Board." In its reply and its several communications the charterers averred that "this vessel cleared for Genoa, from this port, fully equipped, manned, and provisioned, and there was no necessity nor right, on vessel's part, to deviate to Norfolk (Hampton Roads). If she had not gone there, there never would have been any question of a permit." During the entire after events the charterers stood on their rights under the charter party, demanded the schooner complete her voyage, and protested against her discharging her cargo.

20 F.(2d)—21

The vessel remained at Norfolk until October 1, 1917, when she was towed to Philadelphia. Thereafter, and against the protest of the charterer, the cargo was discharged, and by stipulation, without waiver of rights, was sold and at a rate that involved a heavy loss as compared with the price in Genoa. Thereupon Albert T. Rosasco, as owner of the bills of lading, brought this libel, claiming to recover as damages $154,750. On hearing, the court below entered a decree in libelant's favor from which it took this appeal.

[1] As we view the case, two questions are involved. First, the defendant contends Albert T. Rosasco has no right of action, because he has not shown title to the bills of lading. Without discussing the proofs in detail, we may say we find this contention without merit. In accordance with their previous, long-continued course of business, the firm of Rosasco Bros., which did business at Pensacola, indorsed these bills of lading and delivered them to the Credito Italiano, a bank at Genoa, which paid them full value therefor. Subsequently the bank indorsed and sold the same to Albert T. Rosasco, who thereupon became the owner of the cargo, and who, under the business practice of the parties, disposed of such cargoes in Italy as he saw fit. On the nondelivery of the cargo, the latter sent his bills of lading to this country for the purpose of bringing suit, and they were produced and are in evidence in this case. The evidence of William S. Rosasco, the other member of the firm, is that Albert T. Rosasco is holder, and indeed the sole owner. Under such facts, the right of the latter to bring this libel is clear.

[2, 3] The second question involved is: Was the going of the schooner into Norfolk, Va., an unwarranted deviation from a charter party to proceed from Pensacola, Fla., to Genoa, Italy? In accepting the charge at Pensacola, and beginning her journey from that port in accordance with the charter, the schooner undertook that she was seaworthy (which, of course, included a competent crew) and that she could commence and carry out the charter voyage with reasonable diligence and without unnecessary deviation. Now that the most direct path from Pensacola to Genoa is not by way of Norfolk and Philadelphia goes without saying, so that, going to Norfolk, as the schooner did, the burden is upon her to show warrant therefor. This she seeks to do by proving what the customary course of sailing vessels was, namely, taking advantage of the Gulf Stream, and coming

up in it as far as the latitude of Cape Henry, and then turning east to Europe. From this it is contended that the distance from there to Norfolk was so small as not to constitute a deviation.

With this contention we cannot agree, for the adjudged cases are otherwise. In Morrison v. Shaw, 2 K. B. 783, where the voyage was from New Zealand to London, it was held a deviation to stop at Havre en route, though this only amounted to an extra 54 miles on a voyage of several thousand miles. In Ardan v. Theband (D. C.) 35 F. 620, a side trip of 40 miles was held a deviation. In Thatcher v. McCulloh, 23 Fed. Cas. 891, where the route was New Orleans to New York, via Havana, a going to Key West was held a deviation, "though it might conduce to expedite the voyage." How firm the law is in holding vessels to their route will be seen in Elliott v. Wilson, 4 Brown's O. Cases 470, where the House of Lords held going 6 miles out of the course specified was a deviation.

The going into Norfolk being a deviation, we find no proof of anything that justified it. Without discussing the grounds alleged and now set up, it is clear from the testimony that the stop at Norfolk was determined on, not while the vessel was at sea, or for anything there occurring, but before she left Pensacola. In that regard Cummins, one of the managers of the schooner, testified:

"Q. Had you known, when the ship left Pensacola, that you could not get sailors for the ship to take her to Genoa? A. They were having all kinds of trouble to get them.

"Q. And you knew, when the ship left Pensacola, didn't you, that you would have to go to Norfolk to complete your crew? A. We had a complete crew.

"Q. Well, to replace your crew? A. No.
*  *  * A. Just previous to the vessel sailing, I was advised by the master that it was impossible to secure a crew to go to Genoa.

"Q. From Pensacola? A. Yes. I told him, if he couldn't get a crew to go to Genoa, to ship a crew as far as Norfolk, and we would see what we could do there.

"Q. And that is what he did? A. He shipped them for Genoa. We have the articles from the United States commissioner.

"Q. But he did come to Norfolk? A. Yes.

"Q. And this letter of September 4th correctly states your understanding of the matter? A. And I always thought, up until lately, that he had shipped the crew for Norfolk.

"Q. You had intended, then, from the start, so far as you were concerned, to go into Norfolk? A. Not to hold the vessel at

Pensacola; to get her out of the Gulf on her way.

"Q. And to go up to Norfolk? A. On her way; yes, sir.

"Q. That is, to Norfolk? A. Yes."

[4] It is unfortunate for the schooner that the master is dead, by reason of there being no proof by him, and that no one on board the vessel could be found, in spite of search, to prove any of the acts necessitating the vessel seeking harbor at Norfolk; but the failure of the vessel to give any notice of her going to Norfolk, and remaining there more than two months without informing the charterers, and doing so then only on inquiry by the charterer, is a course of unexplained conduct not calculated to inspire confidence in the alleged purpose of the vessel to complete this contract of affreightment, the risks and expense of which had, by the entry of the United States into war, been largely increased from the time it was made. Seeing, then, the schooner unwarrantably deviated from her course, it necessarily follows that her coming within the governmental embargo was solely a sequence of her deviation, and if, as we assume for the present purposes, such restraint prevented her from making the voyage, it was a barrier which she herself wrongfully raised, and which therefore she cannot set up as an excuse for noncompliance with her charter obligation.

We here note that the trial judge reached the same conclusion, and was of opinion the charterers then had a right to stand on their contract rights and claim damages, but that they elected not to do so. In that regard he said: "Let us interrupt the recital of events by taking a survey of the situation of the parties at this time, in order to get an appraisal of their respective rights. Assuming the going into the harbor of Norfolk was a deviation from the proper course of the charter party voyage, this was a breach of the contract by vessel, and gave to the other party the clear right to declare the breach and claim damages for the broken contract. The libelants had the further and equally clear right, however, to waive the default, refuse to accept a breach, and to insist upon performance of the contract. They elected to pursue this latter course. It becomes, then, of no importance to inquire whether there was a deviation or not."

But in our judgment this conclusion was not justified by the proofs. In the first place, the charterers were kept in ignorance of the deviation until September following, and remained under the justified impression the vessel was on her way to Genoa. As soon as

they learned of the true situation, and through the months following, they stood on the rights accruing to them by reason of the deviation. Finding the vessel had deviated, they did what they could to help the schooner extricate herself from the plight she had brought on herself, and we find clear proof of their consistently and unequivocally standing on the rights created by the deviation, and no evidence of their abandoning or waiving such rights. Without reciting all the letters and telegrams evidencing their consistently standing on the rights accruing by reason of the deviation, we select as illustrative of their position their telegrams—of September 12th, which states: "Replying to your letter fourth, without prejudice to our rights or those of holders of bills of lading we will aid get permit provided vessel goes forward. We cannot consent to discharge of cargo, but must insist on performance." September 18th: "When you agree for ship that our co-operation shall be without prejudice to any rights we or holders of bills of lading have against ship. Can we co-operate. We are advised ship had no right to go to Norfolk." September 14th: "We shall expect vessel to prosecute and complete voyage, in fulfillment of C/P and B/L and under no consideration can we consent to discharge of cargo anywhere except Genoa, Italy." September 24th: "We do not want any litigation, as you may recollect, and are desirous that the ship sail, but we do not propose, if any rights have accrued to us, by vessel's going to Norfolk (Hampton Roads) instead of Genoa, to waive such rights. This vessel cleared for Genoa, from this port, fully equipped, manned and provisioned, and there was no necessity nor right, on vessel's part, to deviate to Norfolk (Hampton Roads). If she had not gone there, there never would have been any question of a permit; however, as before stated, we shall be only too glad, without prejudice, to co-operate in getting the permit. If our co-operation, on these conditions, is satisfactory, please wire us."

In October the schooner was moved to Philadelphia, and what followed is testified to by William T. Rosasco and is not contradicted:

"Q. Did the vessel remain in Norfolk, or what did she do? Did she proceed from Norfolk to Genoa? A. No, sir.

"Q. Where did she go? A. She came to Philadelphia.

"Q. Did you have anything to do with her coming to Philadelphia? A. Not a thing.

"Q. Did you have anything to do with her going to Norfolk? A. Not a thing.

"Q. When she came to Philadelphia, did she proceed from Philadelphia with this cargo to Genoa? A. No, sir.

"Q. What did she do with it? A. She unloaded the cargo on lighters.

"Q. With your approval or permission? A. With our protest.

"Q. Was the lumber ever forwarded to Genoa? A. No, sir.

"Q. Was it abandoned here? A. Fully abandoned, practically abandoned, according to their own letters. They had nothing to do with it. That is their own statement, the agent of the ship.

"Q. And what did become of it finally? A. It was finally sold.

"Q. Under what circumstances? A. Without prejudice to the shippers, or the holders of the bills of lading, as a necessity."

The letters and wires show that the charterers protested and stated that, if the schooner persisted in discharging, "we will have no alternative but to hold the schooner and/or owners liable for any damages we may suffer," while the purpose of the schooner to abandon was evidenced by the managing owner's notice to Rosasco Bros., viz.:

"This is to advise you that the cargo of lumber, also the rosin, is now on lighters in the port of Philadelphia, and we wish to put ourselves on record to this effect. We do not own the cargo, have no interest in same whatever, and therefore have no insurable interest; so, should there be any loss by fire or marine risk, we will have nothing whatever to do with it or accept any responsibility." [5] It will thus be seen that the charterers did not accept a return on the cargo, but against protest took it because of its discharge and abandonment by the schooner. Under such circumstances they were justified in disposing of it in diminution of damages. And that such was the logic of the situation seems to have been recognized by all parties, who agreed that sale should be made without prejudice, as will appear by the further testimony of William T. Rosasco:

"Q. I understand you were asked about the sale of this lumber to Felin & Co. Under what circumstances and why did you make that sale? A. Well, there was a necessity of selling it. In a few words, it was the necessity of selling it.

"Q. Well, did you accept the lumber here? A. Not at all.

"Q. What was done with it? A. It was loaded by the shipowner.

"Q. What did the shipowner do with it? A. The ship discharged it on lighters and no-

tified us they would have nothing more to do with it, abandoned the cargo.

"Q. And after they had notified you they would have nothing more to do with it, then what did you do? A. Well, then we decided to proceed, and see if we could sell it.

"Q. Did you have any interviews with anybody on that subject? A. Only with you in your office.

"Q. And who was present at an interview on that subject? A. Oh, before the cargo was sold, we had a conference with the shipowner and Mr. Cummins and Mr. Long, to lay the matter before them, at your office.

"Q. Who were there? A. Mr. Long and Mr. Cummins and Mr. McDonald, the shipowner, and Mr. Yocum.

"Q. And at that conference was the sale of this lumber discussed? A. Fully discussed and the best offers exhibited to the meeting there.

"Q. Was there any arrangement entered into then about this sale or how it should be sold? A. Well, the arrangement was that it should be without prejudice to the interests or rights of the shippers or the holders of the bills of lading.

"Q. And after that conference this lumber was sold? A. Yes; some days afterward. I don't remember exactly the date."

[6] Seeing, then, that the schooner wrongfully and purposely deviated from her course, and as a result thereof became unable to and did not complete her voyage, and that the charterers stood upon, protested, and have never waived or surrendered their rights, we think libelant was entitled to have damages assessed on the basis of what the charterers' situation would have been, had the charter been carried out and the cargo delivered at Genoa. In that case the charterers would have been at the expense of the freight charges and insurance, and, having already paid these charges, they would be entitled to receive their cargo at Genoa.

For these reasons we affirm in amount, as of the date of the going down of the mandate of this court, the decree below.