122 F.2d 579 (1941)
THE SAN GIUSEPPE.
M. COOK & SON, Ltd., et al.
v.
SAGLIETTO.
No. 4809.
Circuit Court of Appeals, Fourth Circuit.
August 29, 1941.
*580 Braden Vandeventer, of Norfolk, Va., and Eberhard P. Deutsch, of New Orleans, La. (Vandeventer & Black, of Norfolk, Va., Deutsch and Kerrigan, of New Orleans, La., and Eugene W. Ong, of New York City, on the brief), for appellants.
Leon T. Seawell, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellee.
Before PARKER, SOPER, and DOBIE, Circuit Judges.
PARKER, Circuit Judge.
These are cross appeals in a suit in admiralty brought by British cargo owners against the Italian vessel San Giuseppe which arrived at the port of Norfolk, Va., on June 8, 1940, with cargo destined for London, England, and was interned at Norfolk as the result of the war between Great Britain and Italy, which began June 10th. The suit was for possession of the *581 cargo and for damages sustained as the result of the necessity of transshipment. Decree was entered directing the delivery of the cargo to the owners but absolving the vessel from the damages claimed. The cargo owners appeal from that portion of the decree refusing them damages, contending that the vessel was guilty of deviation in putting into the port of Norfolk and was consequently liable as an insurer for damages sustained by the cargo. The vessel appeals from that portion of the decree charging her with the expense of unloading at Norfolk, contending that under the provisions of the bills of lading this was an expense to be borne by the cargo owners.
The San Giuseppe was an Italian steamship under time charter to the Continental Grain Company and sublet under a voyage charter to the Gans Steamship Line of New York. The voyage charter provided that she should have liberty to coal at Norfolk and Newport News. Early in June she took on a cargo of timber, staves, turpentine and tar at New Orleans, La. and Panama City, Fla., for delivery in London, England, and collected freight thereon in excess of $200,000. The master, in giving notice of readiness to load to the agents of the voyage charterer, had advised that he would call at Norfolk for bunkers, as he had been instructed to do by the time charterers. He left New Orleans with only 617 tons of bunkers aboard and had been instructed to have 600 tons when leaving Norfolk for the voyage across the ocean. He issued bills of lading in the name of the vessel covering the cargo and providing that same was to be transported by the vessel to London "with liberty to call at any port or ports, in or out of the customary order, to receive or discharge coal, cargo, passengers, or for any other purpose". Because of war conditions, it was necessary for vessels bound for England to stop at some Atlantic port for sailing orders for the crossing of the ocean, as these were secret orders, were changed every three or four days and could not be communicated to the vessel at sea. While the vessel was at New Orleans, the master was notified by the British Consul there to get his sailing orders for crossing the Atlantic from the British Consul at Norfolk.
On June 8th, the San Giuseppe entered the port of Norfolk for bunkers and sailing orders. The master applied to the charterer's agent for bunkers but did not take them on, as he was directed by the charterer's agent to see the Italian consular agent at Norfolk, and was directed by the latter to remain in port until further orders. On June 10th he received a radio message from the Italian government advising of Italy's entrance into the war and directing all Italian merchant vessels to seek the nearest neutral port and remain there. He consequently remained in Norfolk. If he had not put into Norfolk but had followed the direct route from the Gulf ports to London, he would have been 740 miles off shore at the time of the receipt of the radio message from the Italian government. Had he been in this position, it would have been his duty to turn about and make for the port of Norfolk, and he testifies that this is what he would have done.
The court below found "that in the shipping trade it has been considered over a long period of time to be a usual and reasonable practice of coal burning vessels similarly situated on voyages from Gulf ports to the United Kingdom or continental European ports to call at Norfolk for bunkers". This was supported by the testimony of a large number of witnesses who were shown to have knowledge of the customs and practices of the trade. It was shown that more vessels coal at Norfolk and Newport News than at any other port on the Atlantic or Gulf coasts of the United States, that coal of superior quality is obtained there, that the price is much lower than at Gulf ports, and that from 1,800 to 2,000 ships a year call there for bunkers. The witness Meyer, president of Gans Steamship Line, the voyage charterer, testified that it was customary for vessels of his company to bunker at Norfolk on such voyages, that this practice had been followed by this vessel on two voyages immediately prior to this, and that marine insurers, who charge an additional premium for extra calls, make no such charge for a bunkering call at Norfolk. The witness Hasler of Norfolk who was arranging to bunker the vessel testified: "It is nothing unusual for a steamer loading general cargo in the Gulf and proceeding to the United Kingdom to call in at Hampton Roads on the homeward voyage to replenish her bunkers. That has been in vogue, to my knowledge, for the last thirty years, anyway". The vessel's master, Captain Saglietto, testified that the twenty ships of his company's fleet, of which he is senior officer, bunker at Norfolk on all voyages from the Gulf to the United Kingdom or continental Europe. Sperling, an officer of Continental Grain, time charters of the *582 vessel, testified: "The custom is usually to bunker at Hampton Roads after loading at the Gulf". "Yes, over a period of six years (period of witness' employment by Continental Grain) say about 90 per cent of our coal-burning vessels loading in the Gulf for either United Kingdom or the Continent bunkered at Norfolk". Stevenson, president of Bulk Carriers Corporation and of Ocean Freighting and Brokerage Corporation, testified: "It has been quite the recognized custom for vessels loading in the Gulf bound for the United Kingdom to go via Hampton Roads for bunkers, * * *. I consider it a reasonable practice". The substance of the above testimony was reiterated by Schulze, president of Richard Meyer Company, Havens, an officer of the Strong Shipping Company, Gavigan, president of Funch Edye & Company, and Salzmann, employed by the latter company in charge of its Gulf to Scandanavia operations.
There was no testimony in contradiction of the above, except that the cargo owners introduced a list showing that only a little over 11 per cent of coal-burning vessels bound from Gulf ports for ports in the United Kingdom stopped at Norfolk for bunkers during the five and a half year period preceding the voyage in question. This list, however, did not show the vessels which put into Norfolk for some other purpose as well as for bunkers nor did it show vessels bound for continental ports which bunkered there, or which of the vessels came to the Gulf ports with sufficient bunkers for a return voyage, a frequent practice prior to the war on the part of vessels from European ports making a voyage and return to ports of the Gulf.
The bills of lading provided that the prepaid freight "shall be deemed fully and irrevocably earned upon receipt of the goods by the carrier". They contained the usual "restraint of princes" provision and a war risk clause quoting a provision of the time charter to the effect that, if the vessel were prohibited from going to the port of discharge by the government of her flag, she should discharge the cargo at any other port covered by the charter party as ordered by the charterers and be entitled to freight as if she had discharged at the port to which she had been originally ordered. The cargo owners do not controvert that the effect of these protective clauses, if applicable, is to exonerate the vessel from liability for the damages claimed by them; but their contention is that the protective clauses are not applicable because, they argue, in calling at Norfolk the vessel was guilty of unreasonable deviation, the effect of which was to displace the protective clauses and render her liable for the damage sustained by the cargo owners, irrespective of whether there was or was not causal connection between deviation and loss. The court below held that the call at Norfolk was a reasonable deviation and that the vessel did not thereby forfeit the protection of the contract of carriage. It held, also, that a further reason for denying damages was the lack of causal connection between the alleged deviation and the loss.
We agree with the court below that there was no unreasonable deviation on the part of the vessel. Whether the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(4) has enlarged the scope of permissible departure from the course of the voyage, we need not stop to inquire. Prior to the passage of the act, a deviation was defined as a "voluntary departure without necessity or reasonable cause from the regular and usual course of the voyage". 1 Bouv. Law Dict., Rawle's Third Revision, p. 860; Hostetter v. Park, 137 U.S. 30, 40, 11 S.Ct. 1, 34 L.Ed. 568; Constable v. National Steamship Co. 154 U.S. 51, 66, 14 S.Ct. 1062, 38 L.Ed. 903. A departure from the regular course of the voyage through necessity or for reasonable cause was not, under the prior maritime law, a deviation forfeiting insurance or rendering the vessel an insurer; and, for the purposes of this case, we may assume that the words "reasonable deviation" as contained in the statute confer no greater liberty upon the vessel than she had under the rule of the maritime law prior to its enactment. When the liberty to call clause is taken into consideration, we think that the call at Norfolk cannot be considered either unreasonable or without necessity within the meaning of that rule.
It may be conceded that the evidence is not sufficient to establish a custom, within the technical meaning of that term, for vessels bound from Gulf ports to ports of the United Kingdom to call at Norfolk for bunkers. We think, however, that it does establish that such practice is not unreasonable and is within the "liberty to call" clause contained in the bill of lading. While that clause should not be construed as authorizing a complete departure from the general course of the voyage (Swift & Co. v. Furness, Withy & Co., D.C., 87 *583 F. 345) it must certainly be interpreted as permitting a call for bunkers at a port within the general course of the voyage and ancillary thereto, if it is to be given any meaning whatever. The suggestion that such call is authorized only in cases of emergency, or where there is necessity for bunkering by stages, would deny it all meaning, as a call for bunkers, in the absence of the clause, would not amount to deviation under such circumstances. Nor is the vessel to be denied the benefit of the clause because of failure to take on sufficient bunkers for the entire voyage prior to its commencement. One of the manifest purposes of the clause is to give to the vessel some liberty of action with respect to coaling, so that she may avail herself of the privilege of calling for bunkers on the general course of the voyage at ports where coal may be obtained advantageously. As was well said by Cross, J., in the case of J. Peters v. Canada Sugar Refining Company, Montreal Law Reports, 2 Q.B. 420, where the charter party described the voyage from Havana to Montreal via the River St. Lawrence, and where the ship cleared Havana for Sydney with only enough coal to reach that point and stopped at Sydney for bunkers:
"The declaration that the vessel was in every way fitted for the voyage, did not contradict or exclude the exception in the charter that she was at liberty to call at any intermediate port for coal. The exception implied that the calling for coal was a convenient incident of the voyage which the ship might avail herself of, and a presumption that a full provision of coal at Cuba for the whole voyage might be inconvenient, and not a necessity; that a vessel was sufficiently sound and provided for a voyage when she had such supply of coal as suited the route, a complement being more suitably obtained at a call port where she reserved liberty to stop for a supply, besides which, it was the duty of the charterer, in order to protect himself, to have insured according to the terms which he had agreed to by the charter, making the same exception in the policy as was contained in the charter."
Pertinent also is the recent decision of the House of Lords in the case of The Indian City, Reardon Smith Line, Ltd. v. Black Sea & Baltic General Ins. Co., Ltd., [1939] App.Cas. 562, referred to by the court below. In that case the vessel was on a voyage from Poti in the Black Sea to a port of the United States. Instead of taking on oil bunkers at Poti she called for same at Constantza in Rumania. The contract gave the vessel liberty to call for the purpose of bunkering. In holding that this did not constitute deviation, Lord Wright said:
"In 1930 cheap fuel oil for bunkers became available at Constantza in Rumania. Constantza, thereupon, became largely used as a bunkering port in particular for vessels bound from the Black Sea on long ocean voyages. In 1932 and 1933, 114 oil-burning vessels called at Constantza for bunkering only. This figure shows the importance of the port as a bunkering port. It is not necessary to analyze closely what proportion of oil-burning vessels sailing through the Bosphorus on ocean voyages bunkered at Constantza. It is sufficient for purposes of this case to record what has been accepted on both sides, namely, that 25% of the whole number called and bunkered at Constantza in the three and a quarter years before the casualty which overtook the Indian City. I emphasize these facts, because the position of Constantza as a usual and recognized bunkering port in the Black Sea seems to me to be a key point in the case. * * * In modern times in all long ocean voyages, the need to replenish bunkers (coal or oil) has to be considered. The doctrine of stages of the voyage which enables a shipowner to start with bunkers sufficient for the stage, so long as he fills up his bunkers at the next bunkering port, necessarily involves calling at that port, and also perhaps, later ports, in order to fulfill the recurring obligation to keep the vessel seaworthy in regard to bunkers. Thus to call at such ports has become an ordinary incident of the voyage. The need to do so may help to determine the general route, for instance, whether it is to be by the Cape of Good Hope or the Suez Canal. A shipowner is entitled, with certain limits determined by what is reasonable, to be guided in his choice of bunkering ports by considerations of cheapness and convenience. * * * He may decide to fill up his bunkers after sailing from the port of loading at some convenient port. He may decide to do this at Constantza, at Istanbul, or at Algiers, or at Oran, or at Ceuta, all of which are available bunkering ports, starting from the loading port with sufficient bunkers to take the ship to the next bunkering port which he decides to use. In this way he selects the stage for bunkering. *584 The vessel must be seaworthy for that stage, but it is the ship owner's province to fix the stage, that is, to determine where he will bunker, so long as his decision is reasonable and usual. In the present case, as in the other voyages during the relevant period, the appellants selected Constantza as the bunkering port. Their case is that they had done so a great many times without objection and save in this one case without mishap. They relied on all the evidence to which I have briefly referred to support their claim that the route by Constantza is a usual route. The position therefore is that to call at some port for bunkers is no deviation, and the only question is whether Constantza is a usual and reasonable port of call for this purpose.
"I agree with Greer, L. J., that the evidence that 25% of oil-burning vessels sailing from the Black Sea on ocean voyages call at Constantza for bunkers is sufficient to show a usual route. The shipowner is not here attempting to prove a custom. To prove a custom he would have to show that it was uniform and universal in the trade, but that is not what is in question here. Nor need he show that other routes were not available, that is, that there were not alternative ports of call at which he might bunker. There are no doubt other available ports of call for this purpose, some, and perhaps all, of which would involve much less extra steaming. I think the shipowner is entitled to balance the cost to him of extra steaming against the cheapness or convenience of Constantza, so long as to do so is not unreasonable in regard to the interests of the charterer or any other persons who might be concerned."
In point, too, is the supplemental opinion of Judge Learned Hand in The Blandon, D.C., 287 F. 722, 725, in which was involved an alleged deviation to Philadelphia to take on cargo on a voyage from New York to Valencia. In holding that this call did not constitute a deviation in the light of the liberty to call clause, Judge Hand said:
"In my earlier decision I neglected to observe the clause in the main body of the bill of lading; that point not being argued at the hearing or in the briefs. It is this: `With the liberty to call at any port or ports in or out of the customary route in any order.' The question is whether this clause justified the ship in calling at Philadelphia, a deviation which I have held to have been otherwise unjustified. If these words are to mean anything at all, it seems to me that they must include such a stop as Philadelphia. True, it was not a stop on the customary route; at least, I must assume so on this record. Yet it was expressly agreed that the port might be `out of the customary route.' What more limited sense can those words mean than a stop at a place some thirty hours away? It is said that the clause will allow only reasonable deviations, and this is indeed true, since such a clause is to be construed in its context. Swift & Co. v. Furness, etc. [Co.] (D.C.) 87 F. 345. For example, it might not allow a side voyage to Tampico or Galveston; certainly it would not permit a call at Rio or Montevideo. But it must mean to give the ship permission to steam by a different route from that she was otherwise bound to take, besides giving her leave to make ports of call en route; i. e., `in * * * the customary route.' Such permission involves delay, and was meant to involve delay."
The law relating to "liberty to call" clauses was well summed up by the District Judge in W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, D.C., 7 F. 2d 889, 891, 892, affirmed 9 Cir., 12 F.2d 519, certiorari denied 273 U.S. 717, 47 S.Ct. 109, 71 L.Ed. 856, as follows:
"As a conclusion from all the cases, it is apparent that the `general liberty' clause is not treated as of `no effect.' It is a stipulation of the parties, to be given effect, like other stipulations, in so far as it does not conflict with the Harter Act (Comp.St. §§ 8029-8035 [46 U.S.C.A. §§ 190-195]), or the general purpose and policy of the law, or the real intent of the contract between shipper and carrier. It may be fairly said that reservations by a carrier of general liberties of departure from the route of the contractual voyage must be read in due relation and subordination to the main commercial purpose of the contract of affreightment, and as a matter of law will justify only such deviations from that route as are consistent with that particular commercial purpose.
"The propriety of any particular deviation is a question of fact in each case and there is no fixed rule for such determination. It is a question of inherent reasonableness, and pertinent to the inquiry of the surrounding circumstances, namely, the commercial adventure, which is the subject of the contract, the character of the vessel, *585 the usual and customary route, the natural and usual ports of call, the location of the port to which the deviation was made, and the purpose of the call thereat."
See, also, the Nichiyo Maru, D.C., 14 F. Supp. 727, 729, affirmed 4 Cir., 89 F.2d 539; United States v. Los Angeles Soap Co., 9 Cir., 83 F.2d 875, 889; The Salvore, 2 Cir., 60 F.2d 683, 685; The Half Moon, D.C., 21 F.2d 447, affirmed Callister v. U. S. Shipping Board, etc., Corp., 2 Cir., 30 F.2d 1008; Dietrich v. U. S. Shipping Board E. F. Corp., 2 Cir., 9 F.2d 733; The Emelia S. dePerez, D.C., 287 F. 361, affirmed 2 Cir., 288 F. 1019; The Citta DiMessina, D.C., 169 F. 472; The Sidonian, D.C., 34 F. 805.
We find no binding authority to the contrary in the cases relied on by the cargo owners. The Willdomino, 272 U.S. 718, 47 S.Ct. 261, 262, 71 L.Ed. 491 was a clear case of deviation. The vessel cleared Ponta Delgada for New York without sufficient coal for the voyage and then, after proceeding for five or six days on the course to New York, changed her course for North Sydney, Nova Scotia. The court held that proceeding for five or six days on the course for New York was a deviation from any permissible course to North Sydney, but did not hold that she might not have called at North Sydney under the terms of her bill of lading. On this point the court said: "Nothing in the present bills of lading suggests that the vessel might wander about the sea, heading first for one port, and then without adequate reason for another. If the Willdomino had the privilege of going from Ponta Delgada to North Sydney and intended so to do, it was her duty to take the ordinary course. This she did not do."
The Henry W. Cramp, 3 Cir., 20 F.2d 320 in no way involved the right to call for bunkers as an incident of the voyage under a liberty to call clause, but was the case of a sailing vessel which sailed from Pensacola, Florida for Genoa, Italy, and which put into Norfolk and stayed there for two months without any reason or excuse disclosed by the record. The case of Hurlbut v. Turnure, 2 Cir., 81 F. 208, affirming, D. C., 76 F. 587, is more nearly in point, but that was a case of general average. The vessel there had cleared from Cuba for New York with an insufficient supply of fuel and had been obliged to burn a part of her cargo and equipment to get into Newport News. What was decided was that the vessel could not throw into general average the cost of putting into the port of Newport News merely because the bills of lading gave her the right to call there. The court held that not having fulfilled her duty to take the usual supply of coal when sailing for New York, she must be deemed to have voluntarily taken the risk of putting into some port of call in order to make that supply good. Whether it would have constituted a deviation for the vessel to have put into Newport News if she had sailed for that port with sufficient coal for the voyage was not directly involved.
There is another ground upon which the call at Norfolk is justified, not only as being reasonable, but also as being necessary in the prosecution of the voyage to London. The war between England and Germany was in progress and a crossing to England was fraught with the gravest danger to a vessel carrying a contraband cargo. Before a crossing of the ocean could be attempted, it was necessary for the vessel to call at an Atlantic port for sailing orders, so that she might know where to meet her convoy and protect herself in the meantime from the danger of German raiders and submarines. These orders could not be communicated to the vessel at sea because of the necessity for secrecy, and they could not be given her at New Orleans or Panama City because they were changed every few days. A call at some Atlantic port for such orders was, therefore, a necessary incident of the voyage; and, as Norfolk was the most convenient port and was the port at which bunkers were to be taken, a call there for sailing orders was directed by the British consul at New Orleans. Even if there had been no intention to take bunkers, a call at some Atlantic port would have been necessary, and Norfolk, being the nearest and most convenient, was the logical port at which to call. The intention to take bunkers there, even if a call for that purpose alone would not have been justified, cannot make the vessel guilty of a deviation in making the call for orders which she was under the necessity of making. To say that she would have stopped for bunkers whether she needed the orders or not is beside the point, for she must have stopped for orders whether needing the bunkers or not. In the absence of the "liberty to call" clause in the bill of lading, such necessary call in pursuance of the voyage could not be held a deviation. It was certainly not an unreasonable exercise of the privilege conferred by that clause.
*586 Even without the necessity of calling for orders, we think that the call at Norfolk would have been justified by the prevailing war conditions. As a matter of fact war was only two days off when the call was made, and already Italian consuls were refusing to permit vessels in port to put to sea. For a vessel to seek port under such circumstances could hardly be held an unreasonable deviation from her voyage. The Kronprinzessin Cecilie 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960. That the captain may not have known of the imminence of war, would not, we think, deprive the vessel of the right to rely upon the fact that, in calling at Norfolk, she in fact did precisely what she should have done in the light of existing circumstances. If she did what was right, she ought not be deprived of the benefit of right action because the captain may have acted more wisely than he knew.
If the call at Norfolk were deemed a deviation, a grave question would be presented as to whether the damages claimed by the cargo owners would be recoverable; for unquestionably the damage resulting from transshipment must have been incurred by the cargo owners whether deviation by the vessel had occurred or not. The vessel, if she had continued on her direct course to London, would have been only 740 miles from Norfolk when the radio message was sent out announcing the war between Great Britain and Italy and directing Italian vessels to put into the nearest neutral port. It would have been her duty to obey this order; and her master testifies that he would have put into Norfolk as the nearest available port, the reasonable thing for him to do under the circumstances. While it is true that, upon a deviation, the vessel becomes an insurer of the cargo, the doctrine seems fairly well established that she is not liable for loss or damage which "must equally have occurred even if there had been no deviation". Scrutton on Charter Parties and Bills of Lading, p. 310; Story on Bailments, 8th Ed., pp. 466, 467; Williston on Contracts, § 1096; James Morrison & Co. Ltd. v. Shaw, Savill & Albion, Ltd., [1916] 2 K.B. 783; The Hermosa, 9 Cir., 57 F. 2d 20, 27; Maghee v. Camden, etc., R. Co. 45 N.Y. 514, 6 Am.Rep. 124; Memphis & C. R. R. Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; The Ida, 2 Cir., 75 F.2d 278; Globe & Rutgers Fire Ins. Co. v. United States, 2 Cir., 105 F.2d 160, 166; The Caterina Gerolimich, D.C., 43 F.2d 248, 252. Since we are of opinion, however, that there was no deviation by the vessel, it is not necessary to decide this point.
On the appeal of the vessel, also, we think that the decree below should be affirmed. The vessel contends that cargo owners should bear the expense of discharging the cargo at Norfolk because of the provisions of paragraph 11 of the bill of lading, the pertinent portion of which is as follows:
"In the event of war or hostilities existing or threatened, the goods shall at all times be at the sole risk of the owners thereof of arrest, restraint, capture, seizure, detention or interference of any sort by any power; and the carrier and its representatives are privileged in their absolute discretion, if deemed advisable for the protection of the vessel or of any cargo or to avoid loss, damage, delay, expense, danger, either with or without proceeding to or toward the port of discharge or entering or attempting to enter or discharge the goods there, and whether such entry or discharge be permitted or not, to proceed to or remain at any other port or ports, including the port of shipment, once or oftener in any order or rotation retaining the goods on board or discharging the same at the risk and expense of the owners thereof at such port or ports at the first or any subsequent call, and full freight and all other charges shall be paid by shipper, consignee, and/or owner, and the goods shall be subject to a lien therefor".
The vessel, however, did not proceed under this clause of the bill of lading. She refused to discharge the cargo or to deliver it to the owners until ordered to do so by the court below; and the court ordered the delivery on the ground that the venture had been frustrated by war and that the owners were entitled to the possession of the cargo. Whose duty, then, was it to make delivery? If the goods had been carried to London, no question is made that both under the terms of the bills of lading and under the provisions of the Carriage of Goods by Sea Act that duty rested upon the vessel. Is the duty any less because war conditions have absolved her from making a portion of the voyage for which she has been paid? We think not. As pointed out by the court below, there is no showing that it would cost the vessel any more to discharge at Norfolk than at London, and there certainly is no reason *587 to think that the cost of discharge at Norfolk is as great as the cost of discharge at London plus the cost of transportation across the ocean, of which the vessel has been relieved. In such situation, it is not unreasonable, we think, to require the vessel to bear the cost of unloading and thus to carry out to the extent of her ability the obligation which she has undertaken.
And we think that the burden of unloading in such situation is imposed upon the vessel and her owners by a reasonable interpretation of the provision of the war risk clause of the time charter quoted in the bill of lading. That clause is as follows:
"No bills of lading to be signed for any blockaded port and if the port of discharge be declared blockaded after bills of lading have been signed, or if the port to which the ship has been ordered to discharge either on signing bills of lading or thereafter be one to which the ship is or shall be prohibited from going by the government of the nation under whose flag the ship sails or by any other government, the owner shall discharge the cargo at any other port covered by the charter party as ordered by the charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered." (Italics supplied.)
Here the vessel was prohibited from going to the port of discharge named in the bill of lading by the government of the nation under whose flag she was sailing. She was in a port covered by the charter. While the discharge was not ordered by the charterers, it was ordered by the court on motion of the cargo owners, who stood in the shoes of the charterers in so far as the duty of the vessel and her owners to discharge cargo was concerned. No authority is cited as to why the vessel should not bear the burden of discharging the cargo under such circumstances, and we know of none. On the contrary, we think that the spirit, if not the letter of the contract of carriage, places that burden upon the vessel and that in equity and good conscience that is where it belongs.
For the reasons stated, the decree appealed from will be affirmed both on the appeal and the cross appeal.
Affirmed.