**CALLISTER v. UNITED STATES SHIP-PING BOARD MERCHANT FLEET CORPORATION et al.**

**THE HALF MOON.**

District Court, E. D. New York. June 13, 1927.

No. 6583.

1. **Principal and agent** ☞101(2)—Owner, suing for damages to apples in shipment, held bound by contract for shipment made by agent.

Regardless of whether alleged owner, suing for damages to apples in shipment, was owner at time of shipping or became owner thereafter, pursuant to agreement with one arranging for shipment, he was bound by contract made by such person for shipment, since, if he was owner, such party was acting as his agent.

2. **Shipping** ☞106(3)—Contract for shipment of apples held to incorporate bill of lading by reference.

Agreement for shipment of apples, providing that terms of regular bill of lading, copy of which was attached, were to apply to shipment, incorporated bill of lading into contract by reference, and libelant suing for damages in shipment was bound thereby, regardless of whether he knew agreement was made, in view of fact that party making it acted either as owner of apples which he subsequently sold, or as agent libelant.

3. **Shipping** ☞132(5½)—In action for damages to apples in shipment based on deviation, evidence held to show ship's agent did not agree to Alexandria as first port of call.

In action for damages to apples in shipment based on deviation, evidence held to show that ship's agent did not agree that Alexandria should be first port of call.

4. **Shipping** ☞125—Failure of ship to sail by certain date because not loaded, and demand for payment pursuant to contract, held not deviation authorizing recovery for damages to goods in shipment.

Alleged failure of ship to sail for five days after being loaded, and demand for payment of balance of freight, held not to constitute deviation authorizing recovery for damage to goods in transit on showing that loading was not completed by date alleged by libelant, and in view of contract for shipment and bill of lading showing parties' intention that freight was to be prepaid.

5. **Carriers** ☞153—Failure to deliver bills of lading to shipper who had left country held not to prevent carrier's claiming benefit of exemptions therein.

In action for damage to goods in transit, respondent's failure to deliver bills of lading to shipper, who had left country without direction as to their delivery, did not prevent their claiming benefit of exemptions therein.

6. **Shipping** ☞125—Stop at port en route, increasing distance from 180 to 250 miles, held permitted by bill of lading.

Where bill of lading gave ship liberty before or after proceeding toward port of discharge to call, enter, or stay at any ports or places for any purposes, stopping at place on customary route of vessels in that service, increasing journey not more than from 180 to 250 miles, was within liberty accorded, and did not constitute ground for recovery for damage to goods in transit.

7. **Carriers** ☞68—Bill of lading, made part of shipping agreement, cannot be modified by shipper except by written agreement.

Where contract for shipment of apples made regular bill of lading according liberty of stops en route part thereof by reference, shipper cannot, in action for damages to goods in transit, modify it as to right to stop en route except by written agreement for such purpose.

8. **Shipping** ☞125—Discharge of grain cargo as rapidly as possible at point en route held not deviation authorizing recovery for damages to goods in transit.

In shipper's action for damages to apples in transit, where contract of shipment made bill

of lading containing liberty to stop at ports en route part thereof, stopping at port en route to discharge grain cargo, which was discharged as rapidly as possible, did not constitute deviation making shipper liable.

9. **Carriers** ⬤➡132—**Carrier held to have burden to show that damages to apples occurred from excepted clause in bill of lading.**

Carrier, sued for damages to apples in transit, which were received in apparent good condition and delivered in damaged condition, had burden to show damage occurred from excepted clause in bill of lading, made part of contract of shipment by reference.

10. **Shipping** ⬤➡132(5⅝)—**Evidence held to show that carrier was not liable for damages to apples in transit.**

In action for damages to apples in transit, where contract of shipment was only for ordinary stowage and stated that ship was not insulated nor cooled, evidence that apples had been stowed in as cool and well-ventilated place as possible, contrary to shipper's claim of negligent stowage in proximity to wheat and flour, *held* to show carrier was not liable.

11. **Shipping** ⬤➡140(1)—**Perishable nature of apples and lack of evidence of successful shipment over same route held to render provision relieving carrier from responsibility for injury, without its default or negligence proper.**

Perishable nature of apples shipped, obvious risk, and lack of evidence of successful shipment of apples from New York to Alexandria, Egypt, *held* to render valid provision in shipping contract relieving carrier from responsibility for damages without its negligence or default.

12. **Shipping** ⬤➡128—**Where subjecting apples to increased temperatures calculated to cause speeding decay, vice was inherent, and, in absence of negligence, carrier was not liable.**

In shipment of apples, part of which had been in cold storage, from New York to Alexandria, Egypt, where subjecting them to temperature of over 34 degrees Fahrenheit was calculated to cause speedy decay, such vice was inherent, and, in absence of negligence, carrier was not liable, especially in view of shipping contract providing that ship could give ordinary stowage but was not insulated nor cooled.

In Admiralty. Libel by Herbert J. Callister against the United States Shipping Board Merchant Fleet Corporation, sued as the United States Shipping Board Emergency Fleet Corporation, and the United States, owner of the steamship Half Moon. Dismissed.

Cutting, Phillips & Hall, of New York City, for libelant.

William A. De Groot, U. S. Atty., of Brooklyn, N. Y. (William E. Collins and Edwin H. Mead, Sp. Asst. U. S. Attys., both of New York City, of counsel), opposed.

CAMPBELL, District Judge. This is a suit to recover for alleged damages to 4,000 barrels of apples carried from New York to Alexandria, Egypt, by the steamship Half Moon.

The libelant was and is a real estate operator. He had known Malaxos Malaxos, who had a factory at 3902 Sixth avenue, Brooklyn, N. Y., on which the libelant had held a second mortgage.

His story is that, relying on the representations of Malaxos Malaxos as to the trustworthiness of his brother, Gabriel Malaxos, libelant took the advice of Gabriel Malaxos and Malaxos Malaxos as to the apple market in Egypt, and agreed to ship apples for the holiday season.

The purchasing of the apples and the arranging for their shipment was left to Gabriel Malaxos, who bought and shipped the apples in his own name. The apples were consigned to Gabriel Malaxos' firm, Malaxos Freres & Co., in Alexandria, he and they being known in the Egyptian market.

Gabriel Malaxos was to be compensated through disposing of the apples in Egypt, and libelant says that there was no written agreement with the Malaxos with reference to this transaction, involving, according to the libelant, the investing by him of over $70,000 in a venture with which he had no familiarity.

That libelant would invest the large sum stated by him, in the purchase and shipment by Gabriel Malaxos of 4,000 barrels of apples in his (Malaxos') name, without any written agreement, does not seem probable; but, in any event, no one outside of the Malaxos knew that libelant was interested in the apples until December 2, 1924, when he called, with Gabriel Malaxos, at Barr's office, before they started for Egypt.

On December 2, 1922, Gabriel Malaxos and the libelant sailed on the steamship Finland, without having paid the balance of the freight money.

Malaxos Malaxos is dead, and Gabriel Malaxos was not produced as a witness on the trial, nor was his deposition taken. Libelant says Gabriel Malaxos cannot be found. [1] Whether the libelant was the owner of the apples shipped, or became the owner on the steamship Finland when Gabriel Malaxos delivered to him the paper addressed to Messrs. Barker & Co., Alexandria, Egypt, which libelant says was delivered on board the steamship Finland on December 4, 1922, reading as follows:

"On Board S. S. Finland.

"Red Star Line.

"Messrs. Barker & Company, Alexandria, Egypt—Gentlemen: (Subject, 4,000 barrels apples S. S. Half Moon from New York.)

On receipt of this order you are to deliver, to bearer Herbert J. Callister or order, any and all kinds of documents meaning bills of lading & receipts that have to do directly or indirectly with this shipment of apples, without question. My purpose in giving this order is because the apples are and belong to said Herbert J. Callister notwithstanding the fact that same were shipped in my name.

"This letter is your authority for giving said Callister cargo and papers.

"Yours very truly,  Gabriel Malaxos."

—makes no difference, because the agreement of November 1, 1922, made by Gabriel Malaxos, for the shipment of the apples, is binding on libelant.

If libelant was the owner of the apples, then Gabriel Malaxos was unquestionably his agent for the purchasing and shipping of the apples, and libelant is bound by the contracts made by Gabriel Malaxos for the purchase and shipment of such apples.

[2] On November 1, 1922, Gabriel Malaxos, in his own name, entered into a written agreement with the ship's agent for the carrying of the apples to Alexandria, Egypt, on the conditions therein named, and the agreement likewise provided: "All of the terms of our regular bill of lading, copy of which is attached hereto, are to apply to this shipment." The only term of the agreement of November 1, 1922, left open was the freight rate, which was to be agreed on at the time of shipment, but to be not less than the so-called conference rate at that time, and with this exception the agreement, with the form of the bill of lading attached, was a complete document.

The bill of lading was incorporated into the contract by reference. South Atlantic S. S. Line v. London-Savannah Naval Stores Co. (C. C. A.) 255 F. 306; The Susquehanna (D. C.) 291 F. 698, 1923 A. M. C. 930; Ablanset (D. C.) 15 F.(2d) 101, 1926 A. M. C. 774.

It is immaterial whether the libelant knew the agreement was made, as Gabriel Malaxos had power to make it, and in any event libelant did not deny he had heard of it.

[3] It is somewhat difficult to determine from the testimony of the witness Barr, called on behalf of libelant, what he was employed by Gabriel Malaxos to do, but, inasmuch as the only term of the agreement that had been left open was the fixing of the rate, I assume that he was employed as a broker in arranging the rate and to prepare the bills of lading.

Neither Barr nor his corporation selected the line nor the ship for Gabriel Malaxos, because he had already done that for himself,

and had made the agreement of November 1, 1922, before he employed Barr, and it is immaterial whether Barr knew of that agreement.

Barr's testimony, that he read the advertisement in trade papers, showing the route that the Half Moon would pursue, does not seem to me to be of any moment, as that could not have played any part in the selection of the line or ship, because Gabriel Malaxos had made the selection and entered into the agreement before going to Barr.

The witness Barr testified that his office prepared and sent to the Kerr Line the freight contracts of November 8th, and that, when they were sent to the Kerr Line, they contained the words, "Alexandria first port of call," which had been inserted therein pursuant to a conversation between Barr and Vice President Krug, of the Kerr Line.

Barr also testified that his custom was to prepare three copies, send the top copy to the shipper, unsigned, before receiving the signed copy from the ship's agent, send the other two copies to the ship's agent, and have the messenger pick up the signed copy and bring it back, and he would retain it.

As to the conversation which the witness Barr testified he had with Vice President Krug, over four years before the trial, I am convinced he was in error, and, while I have no doubt he may have thought it advisable in November, 1922, and attempted to have the ship's agent agree to Alexandria as the first port of call, all of the evidence and surrounding circumstances negative any such agreement by the ship's agent. The agreement of November 1, 1922, had been made.

Barr and the ship's agent agreed on the rate of $1.50 per barrel, and on both parts of the freight contracts which Barr had sent to the ship's agent the words "Alexandria first port of call" had been stricken out before they were signed.

The top copy, which the witness Barr said was sent to the shipper, Gabriel Malaxos, unsigned, was not produced.

The sending of an unsigned copy of the freight contract to the shipper seems to be unusual, because it is hard to understand what value it would have, and, if the witness Barr is mistaken and a signed part was sent, it would be important, if produced, to show whether the words in question had been stricken out, as it clearly appears that, on the two parts which remained in the hands of the ship's agent, the words "Alexandria first port of call" had been stricken out before they were signed by the ship's agent.

That Barr was mistaken when he testified on the trial to the contrary, and that in November and December, 1922, he knew the ship's agent had not agreed to Alexandria as the first port of call, is proven to my satisfaction, not only by the oral testimony, but by the most impressive testimony, the bills of lading prepared by Barr and sent to the ship's agent after November 8, 1922, in which is found no mention of the provision making Alexandria the first port of call.

If the first part of the freight contract was not signed by the ship's agent, and picked up by Barr's messenger, then the contract was never delivered, as both of the other copies remained with the ship's agent, and the words in question on them had been stricken out before signing, and the ship's agent did not accept the freight contracts in their original form, simply because it did no return a part thereof with notice that such words were stricken out, in view of the custom of Barr to have the signed part picked up by his messenger; neither was the ship bound by the freight contract of November 8th, in the form submitted, simply because it loaded and carried the apples, because in so doing it was carrying out the contract of November 1, 1922.

The agreement of November 1, 1922, with the rate fixed at $1.50 per barrel, and the regular bill of lading of the Kerr Line made a part thereof, was the contract for the carrying of the apples, and did not provide that Alexandria should be the first port of call.

[4] Libelant contends that there was a deviation by reason of the failure of the ship to sail before December 6th, although loaded by December 1st, and the demand for the payment of the balance of the freight, amounting to $5,000; but this contention was not sustained, because the loading was not completed by December 1st, and the agreement of November 1st clearly shows the intention of the parties that the freight was to be prepaid, otherwise why the requirement of the advance payment of $1,000 on signing the agreement?

While libelant makes some point about the freight contract prepared by Barr, on November 8th, providing "freight collect," it is obvious that this was an error, as in the bills of lading subsequently prepared by Barr, and signed for the ship, it is provided "freight prepaid."

[5] Libelant contends that respondents cannot claim the benefit of the exemptions of the bills of lading, because they were never delivered, but this contention has not, in my opinion, been sustained, because the bills of lading were executed in substantially the form in which they were presented by Barr, representing Gabriel Malaxos; the exception being the two clauses placed thereon by rubber stamps, reading as follows:

"In signing and issuing this bill of lading for the master, Kerr Steamship Company, Inc., acts solely as agent for the master and/or the United States Shipping Board and/or the United States Shipping Board Emergency Fleet Corporation and assumes no personal responsibility with respect to the cargo mentioned herein."

"Attention is called to the clause in the contract of affreightment between the steamer and the shipper, dated November 1, 1922, reading as follows: (It must also be specifically understood that the steamer can only give ordinary stowage to these apples. She is neither insulated nor cooled, and, while we will take every care with the stowage and transportation, you must agree that neither steamer nor her owners, nor her agents are responsible for the condition of the apples upon out-turn.)"

The ship's agent sent the bills of lading to be delivered to Gabriel Malaxos, on payment of the balance of the freight, at 3902 Sixth avenue, Brooklyn, N. Y., the only address of his known to it, and ascertained that he had left the country without leaving any direction to whom the bills of lading were to be delivered.

The balance of the freight was paid to the ship's agent by a bank, on directions transmitted by libelant by radio from the steamship Finland, on December 4, 1922, the same day that the so-called declaration of libelant's ownership of the apples was signed by Gabriel Malaxos, and no direction was given as to the delivery of the bills of lading, and surely the ship's agent was not bound to follow libelant and Malaxos to Egypt, to deliver the bills of lading, the form of which had been made a part of the agreement of November 1st.

There is no evidence to sustain the contention of the libelant that the ship's agent intended to make Alexandria the first port of call, and only changed its intention about November 23d or 24th, when it obtained the grain shipped for Torre Annunziati.

The securing of sufficient freight for the East Indies when outward bound on the voyage was not possible, and the ships of the Kerr Line and other ships bound for the East Indies were in the habit of taking cargo for Mediterranean ports, the ship in question, the Half Moon, having stopped at Genoa on her previous voyage, and the West Ma-

homet, the last vessel to sail in this service before the voyage of the Half Moon, had also stopped at Genoa.

[6] The bills of lading prepared by Barr, as well as the copy of the bill of lading attached to and made part of the agreement of November 1, 1922, provided:

"With liberty either before or after proceeding toward the port of discharge to proceed to, or toward, call, enter, or stay at any ports or places whatsoever, although in a contrary direction to, or out of, or beyond, the route to the said port of discharge, once, or oftener, in any order backward, or forward, for loading or discharging fuel, cargo, or passengers, or for any purposes whatsoever, and the same shall not be deemed a deviation, but shall be deemed included within the intended voyage."

Torre Annunziati was a stop on the customary route of vessels in that service, and in making that stop the distance was increased not more than 180 to 250 miles over the direct course from New York to Alexandria, and the stop at Torre Annunziati was within the liberty accorded to the Half Moon in the usual bill of lading of the Kerr Line and the bill of lading prepared by Barr and executed by the Kerr Line. The Sidonian (D. C.) 34 F. 805, affirmed (C. C.) 35 F. 534; The Panola (C. C. A.) 9 F.(2d) 733, 1925 A. M. C. 1173, at page 1185.

[7] In spite of libelant's contention that respondents cannot avail themselves of the liberty accorded by the bills of lading, because the same were never delivered, which he has not sustained, the fact remains that the agreement of November 1, 1922, made the regular bill of lading of the Kerr Line a part of that agreement, and that regular bill of lading accorded that liberty to the Half Moon, and the libelant cannot now modify the bill of lading made a part of the written agreement of November 1, 1922, except by a written agreement for that purpose. The Sidonian, supra, at page 806; The Ile De Sumatra (D. C.) 286 F. 437, 1923 A. M. C. 33; The Blandon (D. C.) 287 F. 722, 725; The Panola, supra; The Citta Di Messina (D. C.) 169 F. 472.

[8] Deviation cannot be predicated on the length of stay of the Half Moon at Torre Annunziati, as the evidence shows that there was no unreasonable delay at that port, but that the grain cargo for that port was discharged as rapidly as possible under the conditions prevailing at that port.

[9, 10] The apples were received in apparent good order and condition, and delivered in a damaged condition, and the burden rested on the respondents to show that the damage occurred from an excepted cause in the bill of lading. Thus it has shown by the proof that whatever damage there may have been was occasioned by the heat of the hold.

The apples were stowed in Nos. 1 and 2 between decks, and no cooler or better place for the stowage of apples could be found on the ship.

The libelant contends that the respondents cannot be excused because the carrier was negligent in stowing the apples and in carrying grain in the lower hold and flour in between deck No. 3.

In considering libelant's contentions as to stowage of the apples and the carrying of grain, and its effects, we must not overlook the following provision of the contract of November 1, 1922:

"It must also be specifically understood that the steamer can only give ordinary stowage to these apples. She is neither insulated nor cooled, and, while we will take every care with the stowage and transportation, you must agree that neither the steamer nor her owners nor her agents are responsible for the condition of the apples upon out-turn."

[11] The perishable nature of the commodity, the great risk which was obvious, and the fact that there is no evidence that any shipment of apples was ever carried from New York to Alexandria successfully, rendered valid the provision relieving the ship, etc., from responsibility for the out-turn, if the apples were injured without default or negligence of the carrier. Liverpool & G. W. S. Co. v. Phenix Ins. Co., 129 U. S. 441, 9 S. Ct. 469, 32 L. Ed. 788.

In addition to the special provisions of the contract of November 1, 1922, the bill of lading contained the following exception: "Causes beyond the carrier's control, * * * strikes or stoppage of labor, * * * heating of holds, * * * decay, * * * prolongation of voyage, * * * or any loss or damage arising from the nature of the goods."

The contention of the libelant, that the barrels of apples were improperly stowed, rested upon his expert's ideas that they should have been stowed in a different manner than that employed by the men who did the stowing, but the things which libelant's witnesses considered important, viz. the prevention of the weight resting on the barrel's bilge, and an ample circulation of air, were accomplished in the way the barrels were stowed, and I accept as more convincing the testimony of the men who saw the cargo stowed,

and therefore find that the libelant has not sustained this contention.

The evidence does not convince me that the respondents were guilty of negligence as charged by the libelant, in carrying grain in the lower holds and flour in the between decks No. 3.

The testimony of libelant's witnesses is very general and not convincing as to conditions in this case, while that of respondent's witnesses is more specific and supported by the fact that there was no evidence of the heating of the grain and flour when it was discharged, and the care taken to prevent it heating the apples would have been effective even if the grain had heated.

That the grain could have taken on sufficient heat from the waters of the Mediterranean to injure the apples is negatived by the fact that there was no sweat damage to the flour or grain.

There is nothing shown by the temperatures, which were regularly taken on the ship and recorded, which would warrant the finding that the grain in the hold, or the flour in between deck No. 3, had caused any unusual heat in the between decks when the apples were stowed, and therefore this charge of negligence was not sustained.

The flour was stowed in the between deck No. 3, and separated from the apples in between deck No. 2 by a bulkhead.

There was a sharp conflict in the evidence as to the condition of the apples when shipped. Libelant said he lacked knowledge on the subject of the purchase and shipment of apples, which I have no reason to doubt, and it is only fair to say that, if Gabriel Malaxos possessed any greater knowledge on that subject, he certainly concealed it.

All that Gabriel Malaxos seems to have done was simply to purchase the apples from John Nix & Co. without apprising them of his intention to ship the apples to Alexandria, Egypt, as none of those engaged, who picked, packed, and forwarded the apples (whose depositions were taken), knew that the apples were intended to be shipped as far east as Alexandria, Egypt. This was far from taking the care which a reasonably prudent person should have taken, as the apples should have been specially packed for that character of export.

The apples, which were freshly picked, had been subjected to the low temperature of November, and many of the others had been in cold storage, where they were kept in a temperature of about 31 degrees.

Undoubtedly all the apples could have been transported safely, even to Egypt, if that temperature had been maintained, but Gabriel Malaxos knew, and the agreement of November 1, 1922, provided, that the steamer was neither insulated nor cooled.

When the apples were examined in New York, and while they were on board the ship there, the temperature was low, as that was in the latter part of November and the first part of December.

I believe the apples were in good condition for export to Great Britain or Northern Europe, but none of the apples, especially those which had been in cold storage, were in a condition where they should have been subjected, in a ship neither insulated nor cooled, to the rising temperatures which should have been expected, even if the voyage had been made directly from New York to Alexandria, and this opinion seems to be in accord with that of those having expert knowledge on the subject of apples, especially those whose depositions were taken.

To subject the apples for any considerable period of time to a temperature higher than 34 degrees was to run a very great risk.

Furthermore, the apples were not packed as they should have been for the voyage in question, as they should have had greater protection inside the heads of the barrels.

No better ventilation could have been given than was provided for the Nos. 1 and 2 between decks where the apples were stowed, and I do not find any fault on the part of the ship.

The evidence is not convincing that the damage occurred at Torre Annunziati, but, in any event, as I have found, the ship had liberty under the bill of lading to call there, and, libelant having failed to show that there was any unreasonable delay in sailing from that port, he has failed to bear the burden of proof resting on him. The Arpillao (D. C.) 241 F. 282; The Dolbadarn Castle (C. C. A.) 222 F. 838; The Patria (D. C.) 125 F. 425, affirmed (C. C. A.) 132 F. 971.

Whatever damage there was to the apples was caused by the rise in temperature, and this was an incident of the voyage reasonably to be expected, due to the nature of the goods, which was an exception of the bill of lading, and not caused by any negligence on the part of the ship.

[12] The subjecting of the apples, especially those which had been in cold storage, to a temperature of over 34 degrees Fahrenheit, was calculated to cause their speedy ripening and decay, and this vice was inherent; therefore, in the absence of the ship's negligence, the carrier is not liable.

The libelant took the chance of shipping

the apples at a low rate, in a ship which was neither insulated nor cooled, and the outturn was not satisfactory, but no negligence on the part of the ship has been shown.

A decree may be entered in favor of the respondents, dismissing the libel, with costs.