**S. L. SHEPARD & CO. v. AGWILINES, Inc.**

No. 4893.

Circuit Court of Appeals, Fourth Circuit.

Aug. 13, 1942.

W. J. McLeod, Jr., and H. Wayne Unger, both of Walterboro, S. C., and Samuel L. Einhorn, of Philadelphia, Pa. (Jefferies, McLeod & Unger and R. M. Jefferies, all of Walterboro, S. C., on the brief), for appellant.

Augustine T. Smythe, of Charleston, S. C., for appellee.

Before PARKER and SOPER, Circuit Judges, and PAUL, District Judge.

SOPER, Circuit Judge:

S. L. Shepard and Company, a copartnership, sues in this case to recover damages for injury to a shipment of watermelons carried on July 8, 1939, from Charleston, South Carolina, to New York City by the S/S Cherokee of the Clyde-Mallory Lines owned and operated by the defendant, Agwilines, Inc. The bills of lading acknowledged the receipt of the shipment in apparent good order when delivered to the ship at Charleston. Evidence which was not seriously controverted showed that the melons, or a substantial portion of them, were in bad condition when they reached New York. The steamship company undertook to show that the deterioration was due to the development of diseases that were present in the fruit when placed aboard the ship at Charleston, and was not due to rough handling or bad stowage or improper refrigeration, as claimed by the shippers. The District Judge was of the opinion that the defendant had demonstrated completely that it was without fault, and directed a verdict in its favor for the amount of the freight.

The fruit was purchased by the shipper from growers in the neighborhood of Ehrhardt, South Carolina, on several days between June 30 and July 8, 1939. It was examined at Ehrhardt by inspectors of the U. S. Department of Agriculture, and the larger part was graded as U. S. No.

1 and the remainder as U. S. No. 2. It was transported to Charleston by truck on July 5, 6 and 8. Some of it was piled in a shed at Ehrhardt for several days before it was sent to Charleston; and that part of it which arrived in Charleston on July 5 and 6 remained on the steamship pier under cover until loaded on the ship on July 8. Bills of lading were issued to the shippers at Charleston for 420 crates on July 5, 420 crates on July 6, 450 crates on July 8 and 2,996 crates on July 8, or a total of 4,286 crates.

The ship sailed from Charleston for New York on July 8, arriving on the morning of July 10. During the loading at Charleston a sling broke and four of the crates were destroyed. When the melons were unloaded in New York, inspectors of the Department of Agriculture found on July 10 that 25 per cent of the melons examined showed evidence of anthracnose in an advanced stage and 12 per cent showed soft rot in an advanced stage which for the most part was stem end rot or diplodia. A subsequent inspection on July 12 showed 35 per cent of the melons affected with anthracnose and 25 per cent with stem end rot. Thirty-two hundred crates were examined on this day. As a result of these examinations, 605 crates were condemned. There was testimony on the part of the plaintiffs that the condition of the remainder of the melons was such that they were unsalable to the better trade, such as hotels and restaurants, so that the plaintiffs were forced to sell them to a wholesale produce dealer for quick handling. Thirty-six hundred and seventy-seven crates were sold for $2,928.75. These crates, together with 605 which were condemned and 4 which were destroyed at Charleston, make up the total of 4,286 crates delivered to the steamship line. The plaintiffs claim a loss on the shipment of $8,857.77.

The plaintiffs rely upon the rule as to the carriage of goods by sea which is thus set out in Schnell v. The Vallescura, 293 U.S. 296, 303, 304, 305, 55 S.Ct. 194, 196, 79 L.Ed. 373:

"In general the burden rests upon the carrier of goods by sea to bring himself within any exception relieving him from the liability which the law otherwise imposes on him. This is true at common law with respect to the exceptions which the law itself annexed to his undertaking, such as his immunity from liability for act of God or the public enemy. See Carver, Carriage by Sea (7th Ed.) c. I. The rule applies equally with respect to other exceptions for which the law permits him to stipulate.

\*　　\*　　\*　　\*　　\*

"If he delivers a cargo damaged by causes unknown or unexplained, which had been received in good condition, he is subject to the rule applicable to all bailees, that such evidence makes out a prima facie case of liability. It is sufficient, if the carrier fails to show that the damage is from an excepted cause, to cast on him the further burden of showing that the damage is not due to failure properly to stow or care for the cargo during the voyage."

The defense is that the loss was occasioned by an inherent defect, quality or vice of the goods, and that the carrier has no liability for such a loss under the provisions of the Harter Act, 46 U.S.C.A. § 192, which provides in part that if the owner of a vessel transporting merchandise to or from any port in the United States shall exercise due diligence to make the vessel in all respects seaworthy, neither the vessel nor her owner shall be held responsible for damage or loss arising from the inherent defect, quality or vice of the thing carried. The bills of lading contained the following provision: "Except in case of negligence of the carrier or party in possession (and the burden to prove freedom from negligence shall be on the carrier or party in possession), the carrier or party in possession shall not be liable for loss, damage or delay \* \* \* resulting from a vice or defect in the property \* \* \*."

The defendant offered evidence tending to show that the melons were affected with two diseases when delivered to it, that is, anthracnose and diplodia or stem end rot. Anthracnose is a disease of watermelons caused by a parasitic fungus which is capable of puncturing and invading the tissues of the rind and sometimes of the pulp within the fruit. Infection usually takes place in the field and develops later in transport and on the market. It takes approximately 5 to 7 days after infection occurs for any visible signs of the disease to appear, so that its presence is easily overlooked. The progress of the disease is hastened by high temperature and humidity. Temperatures of from 70 to 80° Fahrenheit hasten the development

of the disease, while temperatures below 50° Fahrenheit hold up the progress of the disease although not killing the fungus. The season of 1939 was a bad season for anthracnose in the neighborhood of Ehrhardt, but it was probably no worse than usual.

Diplodia or stem end rot is also caused by a germ or fungus parasite which inhabits decaying vegetable matter and refuse, usually found surrounding watermelon fields, and when a watermelon is cut in the field, the chances of its becoming contaminated in the stem are very great. This disease also develops at high temperatures of 80 and 95° Fahrenheit, and will be slowed down at temperatures between 50 and 55° Fahrenheit. A customary precaution against infection from this cause is the use of a solution of bluestone and starch that is applied to the end of the stem to disinfect the cut surface and to make the fruit safe from that avenue of entry. The evidence showed that the shippers did not use this solution on the goods that were shipped but coated the melons and the stems with a covering of wax. There was some evidence on the part of the plaintiff that the latter method is effective but the great weight of the evidence indicates that the use of the bluestone and starch solution is the customary precaution to take. It was proved that the Atlantic Coast Line Railroad Company requires the prepayment of freight charges on watermelons unless they have been properly treated for the prevention of stem end rot.

Expert evidence on the part of the defendant tended to show that the period between June 30, during which the first melons were purchased, and July 10, when they were delivered in New York, would be a sufficient period to enable both of the diseases if present in the fruit to advance sufficiently to destroy it.

The grading of the melons at Ehrhardt, as above described, was not inconsistent with the presence of the germs in the fruit. U. S. No. 1 melons are characterized as mature, not overripe, well formed and free from decay, anthracnose, &c., and not more than 10 per cent may be below the requirements of the grade. Melons graded as U. S. No. 2 are characterized as mature, not overripe, not badly misshapen, free from decay and from other serious damage, and not more than 10 per cent may be below these require-

ments. "Free from damage" means melons that are not injured to an extent readily apparent upon an examination, and melons showing not more than 15 anthracnose spots are not considered as seriously damaged. A few of the melons were accidentally broken open in the loading of the ship at Charleston, and the evidence indicated that the fruit was so sour that the colored stevedores refused to eat it.

In the absence of any evidence of exposure of the fruit to infection during the voyage, the proof of the diseased condition of the fruit upon arrival at New York, offered by the defendant, made a prima facie showing that the loss resulted from a defect or vice of the property within the meaning of the excepting clauses of the statute and the bills of lading. But it does not follow that no controverted issue of fact was left for submission to the jury. The way was still open to the plaintiffs to show that the deceased condition of the fruit would not have produced the injury and loss if the carrier had not been negligent in handling it. "It is commonly said that when the carrier succeeds in establishing that the injury is from an excepted cause, the burden is then on the shipper to show that that cause would not have produced the injury but for the carrier's negligence in failing to guard against it." Such was the statement of the rule in Schnell v. The Vallescura, 293 U.S. 296, 305, 55 S.Ct. 194, 196, 79 L.Ed. 373, and such the court assumed the rule to be, at least to the extent of requiring the shipper to give evidence of negligence where the carrier has sustained the burden of showing that the immediate cause of the injury is an excepted circumstance.

In the pending case, the burden to prove freedom from negligence seems to rest upon the carrier by virtue of the terms of the bills of lading. Nevertheless, the plaintiffs offered evidence to show that the injury to the melons was caused by the rapid development of the diseases due to improper conduct and neglect on the part of the agents of the carrier, (1) in roughly handling the fruit on the docks at Charleston and at New York, and (2) in stowing the melons improperly in the tween decks and hold of the vessel, and (3) in furnishing insufficient refrigeration in those parts of the ship. In respect to the first two items of neglect, the evidence was far from satisfactory. There was

some evidence of rough handling on the docks, but it was contradicted, and it was not shown that rough handling caused the damage complained of. There was also considerable evidence with respect to stowage; but that produced by the shipper was insufficient in that no admissible testimony was offered to show how the melons should have been stowed, while that offered by the ship as to the actual conditions of stowage was so indefinite and uncertain that it is difficult to understand it. If there were nothing else in the case but these two items, we should hesitate to overrule the decision of the District Court.

The case turns on the question of refrigeration. The Clyde Mallory Lines advertised a fast refrigerated service by steamer for the transportation of fruits and vegetables from Miami, Jacksonville and Tampa to New York. At these Florida ports the carrier maintained precooling plants whereby the normal or field heat of the commodities was reduced before they were placed in the refrigerated compartments of the ships. There was no precooling plant at Charleston and refrigerating service from that port was not offered or advertised. Nor did the freight tariff from Charleston specify refrigeration. The shipment of watermelons in question was nevertheless placed in refrigerated spaces on the Cherokee, in accordance with an arrangement between the shippers and the agents of the line. So much is conceded, but the character of the refrigeration to be furnished is the subject of dispute. On the part of the shippers it was testified that the agents of the line promised a temperature of 38 to 40° Fahrenheit, which is well below that at which the progress of the incipient diseases in the fruit would have been stayed during the voyage. On the part of the ship it was testified that no particular degree of temperature was promised, since there was no facility for precooling the fruit at Charleston and the machinery on the ship was not adequate to take the field heat out of the goods; and that the shippers were warned of these facts but nevertheless insisted upon the acceptance of the shipment. An agent of the line charged with the handling of freight traffic testified in substance that without the precooling of perishables before shipment, the refrigerating equipment of the ships of the line was not strong enough to eliminate the field heat

from the goods and maintain them at a temperature where the progress of field diseases would be checked or stopped.

There was controversy also as to the temperature at which the goods were actually carried. The testimony of one witness for the plaintiffs indicated that the temperature in the hold of the ship on arrival in New York was 95°; but this testimony was directly at variance with certificates of inspectors of the Department of Agriculture also produced by the plaintiffs showing that the temperature of the fruit ranged from 61° to 80° on arrival. Temperature charts produced by the defendant listing the temperature every four hours during the voyage showed that the temperature never exceeded 81° in the refrigerated spaces in which the melons were stowed. The uncontradicted evidence on the part of the ship also showed that no greater degree of refrigeration than that actually furnished could have been produced by the equipment installed on the ship. Refrigeration of the tween decks was begun when the ship left Jacksonville on July 7; and while refrigeration of the hold was not begun until the vessel reached Charleston, the ship had no previous notice that additional melons requiring the use of the hold would be offered for shipment.

The District Judge was of the opinion that the testimony of the shippers that they were promised a temperature from 38 to 40° could not be received to show a special arrangement between the shipper and the carrier, because such an arrangement, if given effect, would have accorded the shipper a preference or advantage not available to all persons under the published tariff, and also because the arrangement would vary the terms of the contract contained in the bill of lading in which no mention of refrigeration was made. Accordingly, the District Judge directed a verdict for the defendant, applying the rule approved by this court in South Carolina Asparagus G. Ass'n v. Southern Ry. Co., 4 Cir., 46 F.2d 452, that the trial judge should direct a verdict where the evidence is of such a conclusive character that if a contrary verdict should be rendered, it would have to be set aside in the exercise of a sound judicial discretion.

■ There is, however, another point of view which requires the submission of the case to the determination of the jury.

The evidence of the carrier itself tended to show that the ship was not equipped to carry the shipment safely in the refrigerated compartments in which it was placed; and if the jury should find this to be a fact, then the acceptance of the shipment imposed a liability upon the vessel for any damage caused by the insufficiency in the absence of some waiver on the part of the shipper. The general rule is that a ship must not accept a shipment of perishable goods unless it is equipped to carry them safely. It was held in The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65, that the seaworthiness of a vessel engaged in the dressed meat trade relates and extends to the refrigerating apparatus necessary for the preservation of the meat during transportation; and a clause in the bill of lading releasing a vessel in that trade from damages even though caused by defects in the refrigerating apparatus is in violation of the provisions of the Harter Act in the absence of proof that the owner of the ship has used due diligence at the commencement of the voyage to make the vessel seaworthy in the sense above described. As to the obligations of a ship with respect to the acceptance of a shipment of perishable goods, see also, The Nichiyo Maru, 4 Cir., 89 F.2d 539.

This rule is precisely applicable to the pending case if the Cherokee was not seaworthy with respect to the commodities offered for shipment in view of the admitted facts. It is true that watermelons can be safely shipped without refrigeration. Customarily, non-refrigerated ventilated fruit cars or automobile trucks are used; and on previous occasions the Clyde-Mallory Lines had transported melons from Charleston to New York in non-refrigerated compartments of their ships under forced ventilation. But the shipment in question was carried in air tight refrigerated compartments, and unless the available refrigeration was adequate, the carrier would ordinarily be liable for an ensuing loss.

■ To meet this aspect of the case, the carrier refers to the evidence that it was reluctant to accept the shipment and did so only after the inadequacy of its refrigerating equipment had been fully explained to the shippers and they had expressed their willingness to take the risk. This defense, if established to the satisfaction of the jury, would in our opinion be sufficient. We know of no reason why a shipper may not waive his right to strict enforcement of a carrier's obligation provided he acts voluntarily and not under compulsion, and the resulting understanding does not violate the law or exempt the carrier from the consequences of his own misconduct or neglect. It was held in The Prussia, 2 Cir., 93 F. 837, that it is competent for the parties by express contract to stipulate with respect to the carriage of a cargo of frozen meats across the ocean, that the carrier shall be exempt from liability for loss or damage in consequence of latent defects in the apparatus which are not due to any fault or negligence on the carrier's part; and that such a stipulation is not in violation of the Harter Act. See, also, Callister v. United States Shipping Board Merchant F. Corp., D.C., 21 F.2d 447; Callister v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 30 F.2d 1008. It is not disputed in the pending case that waiver by oral or written declaration or by conduct is effective. See Ætna Life Ins. Co. v. Frierson, 6 Cir., 114 F. 56; Phœnix Mut. Life Ins. Co. v. Raddin, 120 U.S. 183, 7 S.Ct. 500, 30 L.Ed. 644; New York Life Ins. Co. v. Dumler, 5 Cir., 282 F. 969; McGurk v. Metropolitan Life Ins. Co., 56 Conn. 528, 16 A. 263, 1 L.R.A. 563; Viele v. Germania Ins. Co., 26 Iowa 9, 96 Am.Dec. 83. In the pending case the words "owners' risk" were inserted on the face of all the bills of lading except one for 450 crates.

■ We may assume, as held by the District Judge, that the shippers had no right to preferential treatment, but in the absence of special agreement, they were clearly entitled to rely upon the obligation of the carrier to furnish a seaworthy ship. The burden to show an understanding to the contrary rests upon the carrier, and it must be held liable for any loss occasioned by insufficient refrigeration unless it be found as a fact that the shippers were warned of the inadequacy of the refrigerating apparatus and nevertheless insisted upon shipping the goods. The judgment of the District Court must therefore be reversed and the case remanded for a new trial. In respect to the question of refrigeration the jury must first decide whether the shippers were warned and nevertheless insisted on the shipment in the manner above described; and if they find this issue in favor of the

defendant, they need give no further consideration to the subject of refrigeration. But, if they find this issue in favor of the plaintiffs, they must further find whether the refrigeration was in fact inadequate and whether this inadequacy caused or contributed to the damage of the fruit. Both of the last mentioned two issues must be decided in favor of the plaintiffs to justify a verdict in their favor based on the question of refrigeration. See The Malcolm Baxter, Jr., 277 U.S. 323, 48 S. Ct. 516, 72 L.Ed. 901; The Turret Crown, 4 Cir., 284 F. 439. If the carriage of the fruit in the refrigerated spaces on the ship had no deleterious effect upon the condition of the fruit, the inadequacy of the refrigeration was immaterial, but if unseaworthiness of the vessel caused the melons to be in worse condition upon delivery than they otherwise would have been, the carrier is liable to the extent of the damage attributable to their worsened condition.

We do not mean to restrict the scope of the new trial to the question of refrigeration. On the contrary, questions of rough handling, stowage and ventilation may also be considered by the jury if the evidence should justify such a course.

Reversed and remanded.